958 F.2d 1526
 60 USLW 2714
 R. WAYNE LOWE, individually and as director and principal
shareholder; Jimmy A. Spivey, individually and as
director of International City Bank,
Warner Robins, Georgia, Petitioners,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.
 No. 90-8471.
 United States Court of Appeals,
Eleventh Circuit.
 April 22, 1992.
 
 Gary G. Grindler, Nickolas P. Chilivis, Lillian C. Giornelli, Chilivis & Grindler, Atlanta, Ga., for petitioners.
 Thomas Holzman, FDIC, Washington, D.C., for respondent.
 Petition for Review of an Order of the Federal Deposit Insurance Corporation.
 Before TJOFLAT, Chief Judge, CLARK*, Senior Circuit Judge, and KAUFMAN**, Senior District Judge.
 TJOFLAT, Chief Judge:
 
 
 1
 On April 16, 1990, the Federal Deposit Insurance Corporation (FDIC) issued an order assessing civil money penalties against petitioners, pursuant to the Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1828(j)(4)(A), (B) (1988), for violating the statutory duties of bank directors in policing insider loans. The FDIC construed the statute as assigning liability to any director's action violating its provisions without some further showing of culpability. Petitioners' appeal contends, however, that bank directors only violate the FDIA if their actions both are proscribed by the statute and are negligent. Further, petitioners argue that their actions in this case were not negligent because they reasonably relied on the officers of the bank for the bank's compliance with the statute; consequently, the civil money penalties assessed against them are based upon the FDIC's misreading of the statute and, therefore, should be set aside.
 
 
 2
 A careful reading of the statute leads us to agree with the FDIC that petitioners' culpability is irrelevant to establishing their violations of the FDIA. Moreover, the FDIC properly gave due consideration to petitioners' culpability under the statute when calculating the amount of the civil money penalties to be assessed against them. See Fitzpatrick v. FDIC, 765 F.2d 569, 578 (6th Cir.1985). Accordingly, we find petitioners' civil money penalties to be assessed properly by the FDIC and to be supported by substantial evidence based on the record taken as a whole, see Sunshine State Bank v. FDIC, 783 F.2d 1580, 1584 (11th Cir.1986). We therefore affirm the FDIC's order.
 
 I.
 
 3
 In January 1985, petitioners R. Wayne Lowe and Jimmy A. Spivey, plus three other local businessmen from Warner Robins, Georgia, organized International City Bank (ICB or the Bank) and its board of directors, elected Lowe chairman of the board, and opened the Bank for business.[1] Given the small size of the venture, ICB used Lowe's businesses to build and to furnish the Bank, as well as to landscape and to maintain the premises. In addition, ICB relied on Lowe's extensive business contacts to supply the Bank with its initial customers. Within days of its opening, ICB started a policy of near monthly extensions and renewals of credit to Lowe and his related interests--a policy that would lead inexorably to petitioners' frequent violation of the FDIA.[2] Specifically, the Bank's continuing policy of extending credit to Lowe and his related interests resulted in board approval of loans exceeding the insider lending limits of section 215.4(c) of Regulation O[3] for periods totaling 466 days.[4] Furthermore, these loans frequently were made without the prior approval of ICB's board, in violation of section 215.4(b) of Regulation O,[5] and on unfavorable terms involving more than the normal risk of repayment to the Bank, in violation of section 215.4(a) of Regulation O.[6]
 
 
 4
 Of particular interest in this case are Lowe's repeated failures to disclose his related interest in loans brought before ICB's board, while, at the same time, he conducted the board meetings and participated in the discussions of those loans. On March 29, 1985, the Bank made an unsecured loan in the amount of $175,000 to Quintax Equities, Inc. (Quintax), a North Carolina management company with which Lowe had prior and ongoing business dealings, at a time when Quintax had a deficit net worth.[7] Three days later, $147,625 of this unsecured loan to Quintax (Quintax I) was transferred to a limited partnership, Colonial Associates (Colonial), in which Lowe was the sole general partner.[8] At the time that the Quintax I loan was presented to ICB's board by Lowe's attorney, Lowe was chairman of the board and followed the Bank's practice wherein the chairman of the board does not vote on loan proposals.[9] Nevertheless, as chairman of the board, Lowe conducted the meeting and participated in the discussion of the Quintax I loan. Lowe never disclosed his related interest in the loan, claiming at his hearing before the Administrative Law Judge (ALJ) that he did not know at the time of the board's approval that the loan was going to be transferred to Colonial. Consequently, ICB's board never gave prior approval to the Quintax I loan as required by both the Bank's prior practice and section 215.4(b) of Regulation O.[10]
 
 
 5
 In 1986, Quintax asked ICB for a second unsecured loan in the amount of $150,000 (Quintax II), at a time when more than half of the Quintax I loan was still outstanding. On November 19, 1986, Lowe, on behalf of Colonial, signed the second promissory note payable to Quintax, in the amount of $150,000, for "value received."[11] In the loan report to the Bank's board, dated November 20, 1986, the chief executive officer of the Bank stated that the Quintax II loan was to be paid to ICB by Colonial--using the monies Colonial received from its "partners" (investors). By this time, the board was well aware that Colonial was a related interest of Lowe (the June 18, 1986 minutes of ICB's board meeting listed Colonial as one of Lowe's related interests). Nevertheless, three days later, on November 23, 1986, ICB's directors voted to loan $150,000 to Quintax.[12] During the board's discussion of the loan, Lowe never disclosed his interest in the loan and, again, there was no Regulation O approval of the loan by ICB's board.[13] On November 28, 1986, Quintax transferred the Quintax II loan to Colonial's account at ICB.
 
 
 6
 On December 22, 1986, ICB again extended credit to Lowe by purchasing the Dublin Bond issue, a bond issued to build a local nursing home, proceeds of which in the amount of $185,000 were transferred to Prime Time Properties (Prime Time). At the time, Lowe owned fifty percent of Prime Time. Although Lowe's interest in Prime Time was explained in the offering memorandum, the offering materials were not before the board at the time of the board's discussion and vote on the Dublin Bond issue. Again, Lowe participated in the discussion on the bond issue without disclosing his interest in Prime Time. He did, however, abstain from voting on ICB's purchase of the bonds. The Bank's board, including Spivey, however, voted to approve the purchase of the bond issue--an act that again placed ICB in violation of the prior approval and insider lending limit provisions of Regulation O.
 
 
 7
 The Bank's sordid history of Regulation O violations did not go unnoticed by state and federal bank examiners. Between November 30, 1985 and March 31, 1988, five out of six bank examinations of ICB uncovered Regulation O violations. On November 30, 1985, the state examination found two section 215.4(a) violations of Regulation O (creditworthiness), including the lack of adequate collateral to secure the Quintax I loan to Lowe.[14] On July 7, 1986, the FDIC examination found two loans to Spivey in violation of section 215.4(b) of Regulation O (prior approval) and Lowe's acquisition of more than ten percent of the Bank's outstanding stock in violation of section 2(j) of the FDIA. On December 31, 1986, the state examination found a loan to Lowe in violation of section 215.4(b) of Regulation O.[15] On August 31, 1987, the state examination revealed forty-four regulatory violations, including violations of section 215.4(b) (no prior approval on the Dublin Bond Issue) and section 215.4(c) (various loans to Lowe--the Quintax Loans, Peachbelt loan, Prime Time loan--exceeding the fifteen percent lending limit). The magnitude of these and other violations of Regulation O by ICB finally led the Georgia Department of Banking and Finance, on October 23, 1987, to issue a cease and desist order against the Bank. Notwithstanding the state's order to cease and desist, the Bank continued to violate the lending limits of section 215.4(c) for another forty-five days. On March 31, 1988, the final FDIC examination found violations of sections 215.4(a), (b), (c), and (d) of Regulation O, including (not exclusively) continuing violations by both petitioners.
 
 II.
 
 8
 On March 13, 1989, confronted with the record of petitioners' violations of the FDIA and Regulation O and faced with the lack of corrective measures taken by petitioners, the FDIC issued a Notice of Assessment of Civil Money Penalties, Findings of Fact and Conclusions of Law (notice), pursuant to 12 U.S.C. § 1828(j)(4), and 12 C.F.R. Part 308, against petitioners.[16] The notice charged petitioners with the following violations: (1) extensions and renewals of credit to Lowe and his related interests exceeded the fifteen percent lending limit of section 215.4(c) of Regulation O for a period of 534 days; (2) eighteen extensions of credit to Lowe and his related interests made without the proper prior approval of ICB's board of directors as required by section 215.4(b) of Regulation O; (3) the Bank's loans to Quintax (Quintax I and II), which were unsecured, guaranteed by residents in another state, and extended to a company with a negative net worth, violated the creditworthiness requirements of section 215.4(a) of Regulation O; and (4) the petitioners knowingly caused or permitted these violations to occur "as evidenced by their post facto approval of the extensions of credit recorded in the minutes of the Bank's board of directors." FDIC notice, FDIC-89-21K, Findings of Fact and Conclusions of Law, no. 17.[17] The order to pay, which accompanied the notice, required Lowe to pay a civil money penalty of $75,000 and Spivey to pay $7,500. Finally, the notice informed petitioners that they could request a hearing with respect to these alleged charges.
 
 
 9
 On September 5-7, 1989, petitioners' requested evidentiary hearing convened in Macon, Georgia, before the ALJ. In his Recommended Decision (Rec.Dec.),[18] the ALJ concluded that the broad statutory language of section 2(j)(4)(A) of the FDIA assigns liability for any violation that directors of the Bank "participate in." Section 1828(j)(4)(A) provides in pertinent part:
 
 
 10
 (4)(A) Any nonmember insured bank which violates or any officer, director, employee, agent, or other person participating in the conduct of affairs of such nonmember insured bank who violates any provision of section 371c, 371c-1, or 375b of this title, or any lawful regulation issued pursuant thereto, or any provision of section 377 of this title, shall forfeit and pay a civil penalty of not more than $1,000 per day for each day during which such violation continues.... As used in this section, the term "violates" includes without any limitation any action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation.
 
 
 11
 12 U.S.C. § 1828(j)(4)(A) (emphasis added). Accordingly, the ALJ reasoned that petitioners' culpability, or the lack thereof, did not address the question of their participation in the violations of section 1828(j)(4)(A)--inadvertent participation was participation. Lowe and Spivey's "failures ... to prevent the violations at issue constitute[d] a sufficient demonstration of nexus to support findings of liability." Rec.Dec., at 3. Moreover, the ALJ noted that the statutory scheme in section 2(j)(4)(B) of the FDIA provides for consideration of petitioners' culpability in determining the amount of the penalty assessed. Section 1828(j)(4)(B) provides:
 
 
 12
 (B) In determining the amount of the penalty the Corporation shall take into account the appropriateness of the penalty with respect to the size of financial resources and good faith of the member bank or person charged, the gravity of the violation, the history of previous violations, and such other matters as justice may require.
 
 
 13
 12 U.S.C. § 1828(j)(4)(B) (emphasis added).
 
 
 14
 Using this reading of the statutory provisions of the FDIA, the ALJ found that the petitioners had violated the lending limit prohibitions of section 215.4(c) of Regulation O with respect to their participation in twenty-five extensions of credit made and renewed by ICB to Lowe and his related interests extending over a period of 466 days.[19] Further, the ALJ determined that the petitioners violated the prior approval requirements of section 215.4(b) of Regulation O on thirteen occasions in regard to their participation in extensions of credit by the Bank to Lowe and Lowe's related interests. Finally, the ALJ held that the petitioners violated the creditworthiness requirements of section 215.4(a) of Regulation O on two occasions with respect to their participation in extensions of credit by ICB to Quintax (Quintax I and II loans)--both of which the ALJ found to represent indirect extensions of credit by the Bank to Lowe's related interest, Colonial.[20] The maximum penalty allowed for these violations under the statute was $481,000 for each petitioner, see 12 U.S.C. § 1828(j)(4)(A).
 
 
 15
 The ALJ considered next the five mandated factors set out in section 1828(j)(4)(B) for calculating the size of the penalties due.[21] First, he found that both petitioners possessed substantial net worths enabling them to pay the penalties charged in the FDIC's notice.[22] The ALJ concluded, however, that the payment of attorney's fees must be considered in the determination of petitioners' ability to pay. Second, in opposition to the FDIC's notice, the ALJ found that both petitioners had acted in good faith and, as inexperienced and outside directors, had reasonably relied on the expertise of the executive officers of the Bank for ICB's compliance with Regulation O.[23] Third, the ALJ found petitioners' violations to be insignificant because the Bank never suffered a loss as a result of petitioners' actions.[24] Fourth, the ALJ determined that the actions of petitioners did not represent a history of prior regulatory violations because the earlier violations uncovered in FDIC and state bank examinations were not "of the same type" as those underlying the FDIC's notice.[25] Accordingly, the ALJ recommended that a civil money penalty of $13,150 be assessed against Lowe[26] and that no civil money penalty be assessed against Spivey.[27]
 
 
 16
 On April 16, 1990, the FDIC issued its final Decision and Order (order). The FDIC's order affirmed all of the ALJ's findings of fact and conclusions of law[28] except the ALJ's finding of fact that Lowe had acted in good faith and that the actions of petitioners did not represent a history of prior violations, and the ALJ's conclusion of law that attorney's fees must be considered under the "financial resources" prong in section 2(j)(4)(B) of the FDIA. First, the FDIC concluded that although Lowe did not affirmatively conceal his related interests in the Quintax loans and in the purchase of the Dublin Bond issue, he knew of his interests, he knew of the possibility of a conflict if the funds were transferred to his related interests, and he failed to disclose fully his interests to the board. The FDIC reads the prohibitions of section 215.4(b) of Regulation O, therefore, as imposing a fiduciary duty on bank directors to investigate and candidly disclose to the entire board the possibility of conflicts of interest; accordingly, the FDIC found Lowe's nondisclosures to be in bad faith.
 
 
 17
 Second, in considering petitioners' history of prior regulatory violations, the FDIC concluded that the statutory language of section 2(j)(4)(B) of the FDIA does not restrict the meaning of "prior violations" to violations of the "same type." The statutory language simply states that a history of prior insider banking violations, without reference to the type of violation, may and should be considered in assessing civil money penalties. Given that four out of five bank examinations of ICB considered in the FDIC's order revealed some type of regulatory violation, the FDIC found a significant history of prior violations.
 
 
 18
 Finally, the FDIC disagreed with the ALJ's consideration of attorney's fees to mitigate the size of petitioners' civil money penalties. The logic of such a consideration of attorney's fees, the FDIC contended, would negate the proper assessment of civil penalties in cases where the attorney's fees were equal to or greater than the assessed penalties--a result advantageous to litigants who can afford "high cost" counsel. Accordingly, the FDIC's order recalculated petitioners' civil money penalties upward from the ALJ's recommendation, assessing Lowe $35,000 and Spivey $5,000.[29] Petitioners now appeal the FDIC's order.
 
 III.
 
 19
 Although petitioners raise several issues on appeal, the only issue worthy of extended treatment, an issue of first impression in this circuit, concerns the proper interpretation of bank director's liability for policing insider loans under section 2(j)(4)(A) of the FDIA.[30] The FDIC interprets this section to assign liability to any action violating its provisions without some further showing of culpability--inadvertent violations are still violations of section 1828(j)(4)(A).[31] Petitioners, on the other hand, argue that section 1828(j)(4)(A) only applies to those actions that are both proscribed by this section and are negligent.
 
 
 20
 Petitioners' argument is that under the banking laws of Georgia, Ga.Code Ann. § 7-1-490(a) (Michie 1989),[32] bank directors are required only to exercise ordinary care and diligence in the administration of the affairs of the bank and to discharge their duties as directors "in good faith and with that diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances." Id. Petitioners argue further that the FDIA should be read as an extension of Georgia's banking laws and as incorporating such common law standards of care; therefore, the FDIA must also only hold bank directors to a prudent man standard.[33] Such a prudent man standard allows for bank directors to avoid liability under the banking statutes if their reliance upon the expertise of the bank's officers was reasonable. Id. Not to allow for such reasonable reliance, petitioners contend, effectively would be to recognize status (merely being a bank director at the time the bank violates the FDIA) as sufficient nexus for an individual violation of the FDIA.[34] Petitioners conclude that because the defense of reasonable reliance is available to them under section 1828(j)(4)(A), the FDIC erred in assessing civil money penalties against them.
 
 
 21
 A careful reading of the language, the legislative history, and the purpose of the FDIA, however, leads us to agree with the FDIC that petitioners' culpability is not relevant to establishing their violations of section 2(j)(4)(A) of the FDIA and, consequently, the defense of reasonable reliance is not available under this section.[35] The language of section 1828(j)(4)(A) defines a "violation" as "without limitation any action ... for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation." 12 U.S.C. § 1828(j)(4)(A) (emphasis added). This extremely broad definition clearly includes any action, intentional or inadvertent, by which a director "participates in" the bank's violation of the FDIA. See Fitzpatrick v. FDIC, 765 F.2d 569, 576-77 (6th Cir.1985). To hold otherwise, would render the explicit language in section 1828(j)(4)(A) meaningless surplusage.
 
 
 22
 Given the sparse case law, a better understanding of what constitutes director "participation" under section 1828(j)(4)(A) must be gleaned from the legislative history and the purpose of the FDIA. The legislative history of the Financial Institutions Regulatory and Interest Rate Control Act of 1978, see H.R.Rep. No. 1383, 95th Cong., 2d Sess., reprinted in 1978 U.S.C.C.A.N. 9273, which amended the FDIA to authorize the assessment of civil money penalties under section 1828, is consistent with an expansive reading of director's liability in policing insider loans. The statute "[p]lace[s] greater responsibility on boards of directors to oversee their financial institution," id. at 9276, because "[p]roblem banks and insider abuses have been virtually synonomous [sic]. Nothing appears more often on the fever charts of sick financial institutions than self-dealing ailments." Id. at 10, reprinted in 1978 U.S.C.C.A.N. at 9282.[36] Specifically, Congress places two affirmative duties on bank directors under the FDIA, the duties fully to investigate and to disclose interests in insider loans, for which, if violated, the director is found to have participated in the bank's violation of the statute.[37]
 
 
 23
 First, each board member has the affirmative duty to investigate and identify insider loans and not to give his prior approval of the loan (i.e., he must affirmatively oppose the loan) when the statutory lending limits are exceeded or when the creditworthiness of the loan is in question.[38] Second, each director has the affirmative duty to disclose fully to his board his related interests in loans both before his own board and before the boards of correspondent banks.[39] To interpret the statute to permit inadvertent lapses of these affirmative duties, as the petitioners' defense of reasonable reliance would have us hold today, is to thwart the only mechanism by which a board can police insider loans, namely, it will prevent the board from knowing that the loan is an insider loan. This is precisely what happened in this case. Placing petitioners' actions in the best light possible, Spivey inadvertently voted, several times, to approve insider loans to Lowe, violating his affirmative duty to ferret out such loans and affirmatively to oppose them, see Fitzpatrick, 765 F.2d at 578 (approvals of loans forbidden by the FDIA are violations of the statute); incredibly, under this scenario, Lowe also failed to uncover his related interests in these loans and thereby violated his duty to investigate fully, identify, and oppose the violative insider loans as well as his duty to disclose fully his interests in the loans. At worst, Spivey, knowing of Lowe's related interests in the Quintax II and Dublin Bond issue loans, see supra pp. 1527-1529, intentionally failed to withhold his prior approval of the loans and further, he failed to disclose Lowe's interest in the loans to the rest of the board; and Lowe, knowing of his related interests, carefully orchestrated these insider loans, mindful not to present directly the loan or his related interest in the loan to the board, or vote for the loans, and thereby intentionally violated his duty of full disclosure. Under either scenario (the intentional or inadvertent participation in insider loans), the central policing mechanism of the statute, the board's knowledge and prior approval (disapproval) of insider loans, has been thwarted.
 
 
 24
 Furthermore, petitioners' reading of the statute to include the defense of reasonable reliance sets in motion a system of incentives encouraging bank directors not to investigate fully the insider loans brought before them. The less information made available to a director necessarily entails, under the petitioners' proposed reading of the statute, that his greater reliance on the expertise of the bank's officers will be more reasonable; consequently, it is less likely that he will be found liable for his participation in the regulatory violations. Moreover, under the petitioners' interpretation of the statute, the converse is also true; thus, a "director or officer shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause such reliance [on officers of the bank] to be unwarranted." Ga.Code Ann. § 7-1-490(a). In other words, if a director's liability is triggered by his knowledge, the incentive is not to know too much. In turn, the insider can rest more assured that his loans will not be uncovered, if he remains quiet, because no other director will be actively investigating the loans. Such a proposed reading of the statute cuts directly against the explicit language, the stated purpose, and the central policing mechanism that Congress enacted under the FDIA. Accordingly, we reject petitioners' reading of the statute and find, regardless of their claimed inadvertence, that petitioners "participated in" violations of the FDIA as defined under section 1828(j)(4)(A).[40]
 
 IV.
 
 25
 For the reasons stated above, the order of the Federal Deposit Insurance Corporation assessing civil money penalties against petitioners is AFFIRMED.
 
 
 26
 IT IS SO ORDERED.
 
 
 
 *
 See Rule 32-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation
 
 
 [1]
 Lowe later stepped down as chairman of the board. Lowe, however, retained the position of director of ICB and remained the principal shareholder of ICB throughout all relevant periods pertaining to these proceedings. Spivey held the position of director of ICB throughout all relevant periods pertaining to these proceedings
 
 
 [2]
 The FDIA and the regulations that implement the statute, see 12 C.F.R. §§ 215.4(a)-(c) (1988), are made applicable to insured state nonmember banks, such as International City Bank, by section 2(j)(2) of the FDIA, 12 U.S.C. § 1828(j)(2), and 12 C.F.R. § 337.3 (1988). See infra notes 3, 5 and 6
 
 
 [3]
 Section 2(j)(4)(A) of the FDIA specifically identifies violations of "section ... 375b of this title, or any lawful regulation issued pursuant thereto" as subject to "a civil penalty of not more than $1,000 per day for each day during which such violation continues." 12 U.S.C. § 1828(j)(4)(A). Section 215.4(c) of Regulation O, which was issued pursuant to 12 U.S.C. § 375b(1), see 12 U.S.C. § 375b(7) (1988), provides:
 (c) Aggregate lending limit. No member bank may extend credit to any of its executive officers or principal shareholders or to any related interest of that person in an amount that, when aggregated with the amount of all other extensions of credit by the member bank to that person and to all related interests of that person, exceeds the lending limit of the member bank specified in § 215.2(f) of this part.
 
 
 [12]
 C.F.R. § 215.4(c) (footnote omitted)
 Section 215.2(f) of Regulation O provides in pertinent part:
 (f) The "lending limit" for a member bank is an amount equal to ... 15 per cent of the bank's unimpaired capital and unimpaired surplus in the case of loans that are not fully secured....
 
 
 [12]
 C.F.R. § 215.2(f) (footnote omitted)
 
 
 [4]
 Loans to Lowe and his related interests exceeded ICB's 15% limit of its unimpaired capital and surplus, see supra note 3, for the following periods: from July 11 through July 15, 1986; from September 12, 1986 through November 29, 1987; and from January 20 through February 29, 1988. Moreover, as of March 31, 1987, the aggregate total of outstanding loans to Lowe and his related interests equaled 42% of ICB's total equity capital and reserves
 
 
 [5]
 Section 215.4(b) of Regulation O, issued pursuant to 12 U.S.C. § 375b(2), see supra note 3, provides in part:
 (b) Prior Approval. (1) No member bank may extend credit (which term includes granting a line of credit) to any of its executive officers, directors, or principal shareholders or to any related interest of that person in an amount that, when aggregated with the amount of all other extensions of credit to that person and to all related interests of that person, exceeds the higher of $25,000 or 5 percent of the member bank's capital and unimpaired surplus, unless:
 (i) The extension of credit has been approved in advance by a majority of the entire board of directors of that bank, and (ii) the interested party has abstained from participating directly or indirectly in the voting.
 
 
 [12]
 C.F.R. § 215.4(b)
 
 
 [6]
 Section 215.4(a) of Regulation O, issued pursuant to 12 U.S.C. § 375b(3), see supra note 3, provides:
 (a) Terms and creditworthiness. No member bank may extend credit to any of its executive officers, directors, or principal shareholders or to any related interest of that person unless the extension of credit:
 (1) Is made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions by the bank with other persons that are not covered by this part and who are not employed by the bank, and (2) does not involve more than the normal risk of repayment or present other unfavorable features.
 
 
 [12]
 C.F.R. § 215.4(a)
 
 
 [7]
 Lowe had extensive business dealings with Quintax. The relationship between Quintax and Lowe began in 1981 when Lowe sold Quintax his Ramada Inn in Warner Robins, Georgia. This transaction led to a series of motel and housing developments between Lowe, who was the sole general partner of the limited partnerships that owned the properties in question, and Quintax, which was the managing agent for the properties. Lowe testified to his participation in ten such business arrangements with Quintax, including his ongoing participation as the sole general partner of Colonial Associates. See infra note 8
 
 
 [8]
 In 1984, Quintax sold its Holiday Inn in Orlando, Florida to Colonial and acquired the wrap-around mortgage on the property. Colonial, in turn, contracted with Quintax to manage and run the property. The Quintax I loan was to be used by Colonial, therefore, to pay the operating expenses that Quintax had incurred while managing Colonial's Holiday Inn in Orlando, Florida
 
 
 [9]
 All other directors of ICB, including Spivey, voted to approve the Quintax I loan
 
 
 [10]
 See supra note 5 (prior approval provisions of Regulation O). ICB's approval of the Quintax I loan, which was unsecured, guaranteed by residents in another state, and extended to a company with a negative net worth, also violated the creditworthiness provisions of section 215.4(a) of Regulation O. See supra note 6
 
 
 [11]
 In March 1986, the chief executive officer of ICB informed Quintax that the Quintax I loan had to be renewed for $100,000. Quintax, which continued to maintain a negative net worth, did not renew the loan of its own accord. On June 1, 1986, Lowe, as the sole general partner of Colonial, signed a promissory note payable to Quintax in the amount of $100,000, for "value received." On June 23, 1986, with Colonial's promissory note in hand, Quintax renewed the Quintax I loan with ICB for $100,000. On the same day, the vice president of ICB wrote to the president of Quintax informing him that Quintax should not pursue its attempt to refinance the Quintax I loan in the name of Colonial Associates "due to the problems we discussed earlier."
 
 
 [12]
 Again, Spivey voted to approve the Quintax II loan. Lowe, who was no longer the chairman of the board and, consequently, was voting on loan proposals brought before the board, could not recall at his hearing before the ALJ whether he voted for the Quintax II loan
 
 
 [13]
 The Bank's approval of the Quintax II loan, similar to its approval of the Quintax I loan, violated sections 215.4(a) and (b) of Regulation O, see supra notes 5 and 6 (prior approval and creditworthiness). ICB's Quintax II loan, however, also continued the Bank's violation of section 215.4(c) of Regulation O, see supra note 3, for by this time, ICB's lending limit to Lowe already had been exceeded, see supra note 4
 
 
 [14]
 The state examination also uncovered four regulatory violations of Ga.Code Ann. § 7-1-285(a)-(b), see Ga.Code Ann. § 7-1-285(a)-(b) (Michie 1989). Section 7-1-285(a)-(b) of the Georgia Banking Code establishes violations for insider loans exceeding the 15% lending limit of a bank's capital base without prior approval of the board--similar to the combined prohibitions of sections 215.4(c) and (b) of Regulation O. See supra notes 3 and 5
 
 
 [15]
 Four more loans to Lowe were in violation of Ga.Code Ann. § 7-1-285(a). See supra note 14
 
 
 [16]
 The complete board of directors and the chief executive officer of the Bank were initially named as parties. With the exception of the present petitioners, all other directors and officers of ICB were subsequently dismissed as parties as the result of negotiated settlements with the FDIC
 
 
 [17]
 There were at least three instances when the minutes of the board of directors indicated that ICB followed the proper procedures of Regulation O for the prior approval of insider loans (September 17, 1986, November 14, 1986, and December 17, 1986). In two cases, the board attempted to confer prior approval "retroactively" to insider loans (February 18, 1987 and April 16, 1987)
 
 
 [18]
 The ALJ's Recommended Decision was filed in the Office of the FDIC Executive Secretary on December 21, 1989
 
 
 [19]
 See supra note 4
 
 
 [20]
 The ALJ based his finding that Colonial was a "related interest" of Lowe on the following facts: (1) Lowe's personal financial statements listed Colonial as part of his assets; (2) the Bank's internal records listing directors' related interests listed Colonial as a related interest of Lowe; (3) Lowe, as he testified before the ALJ, was the sole general partner of the limited partnership and, as such, he exercised sole binding control over Colonial's affairs; and, (4) given the size of Lowe's compensation, a total of $50,000 general partner fee and $5,000 annual salary as general partner, Lowe exercised significant discretional control over the limited partnership. See, Rec.Dec., at 3 n. 3, Findings of Fact, no. 11; see also 12 C.F.R. § 215.3(f) and 12 C.F.R. § 215.2(k) (defining "related interest" to mean "a company controlled by a person")
 
 
 [21]
 The ALJ also referred to the FDIC's Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Regulatory Agencies, 45 Fed.Reg. 59423 (Sept. 9, 1980), which emphasizes the deterrent nature of the penalties and lists thirteen elements to be considered in determining whether to initiate a civil penalty proceeding
 
 
 [22]
 The ALJ determined the net worth of Lowe to be in excess of $13,017,320 and the net worth of Spivey to be in excess of $840,800
 
 
 [23]
 The ALJ specifically found that Lowe and Spivey acted in good faith for the following reasons: (1) Lowe's failure to disclose his related interests in ICB's loans to Quintax was unintentional, since he did not know at the time of the board's approvals that the proceeds of the loans would go to him; (2) Lowe did not fail to disclose his related interest in the Dublin Bond issue because the offering documents detailed his interest (Prime Time) in the purchase; (3) both petitioners, as outside and inexperienced bank directors, had reasonably relied on the expertise of the executive officers of the Bank for ICB's compliance with Regulation O; (4) neither petitioner exercised undue influence over the board; (5) neither petitioner concealed any material information from ICB's board of directors or FDIC or state examiners; and (6) neither petitioner failed to correct a violation once it was brought to his attention. See, Rec.Dec., at 10-11, Findings of Fact, nos. 118 and 119
 
 
 [24]
 The ALJ offered petitioners' good faith and the lack of direct economic benefit to Lowe and Spivey as further support for the insignificance of their regulatory violations
 
 
 [25]
 The last statutory factor, "such other matters as justice may require," was addressed by the ALJ in his acceptance of the FDIC's charges with respect to the magnitude of petitioners' lending limit violations
 
 
 [26]
 This figure represents a penalty of $25, rather than the $1,000 maximum, see 12 U.S.C. § 1828(j)(4)(A), for each day a lending limit violation was outstanding (466 days) and $100, rather than the $1,000 maximum, id., for each violation of the prior approval and creditworthiness requirements of Regulation O
 
 
 [27]
 This finding represented the ALJ's determination that Spivey had done little, if anything, in furtherance of ICB's violations of Regulation O. Spivey's participation in approving Lowe's loans was based on his reasonable reliance on the inaccurate facts that the officers of the Bank had presented to him. The ALJ also considered Spivey's payment of attorney's fees as sufficient punishment for his part in the Bank's multiple and continuous violations of Regulation O
 
 
 [28]
 The FDIC agreed with the ALJ's reading of the statutory language of section 1828(j)(4)(A) that the statute and regulations clearly assign liability for any violation and "do not require some further showing of culpability.... [c]ulpability is a factor which only affects the amount of the penalty...." See FDIC Decision and Order, FDIC-89-21K, at 17
 
 
 [29]
 The FDIC never provided an explicit accounting of how it arrived at these figures. It is clear, however, that the FDIC's finding of bad faith on the part of Lowe; the FDIC's finding of a significant history of prior regulatory violations attributable to each ICB director, including Spivey; and the magnitude of the violations themselves, carrying a maximum penalty of $481,000, led the FDIC to increase the ALJ's recommended assessments
 
 
 [30]
 Relying on the ALJ's recommended lower assessments, see supra p. 1532, petitioners also contest the FDIC's calculation of their civil money penalties under section 1828(j)(4)(B). In particular, petitioners rely on the ALJ's finding that petitioners acted in good faith reliance on the expertise of the executive officers of the Bank and his finding that there was no history of prior violations on the part of the petitioners
 Our deference, however, is to the agency and not the ALJ. 12 U.S.C. § 1828(j)(4)(D). In accordance with section 1828(j)(4)(D), the findings of the FDIC board are to be set aside only if found to be unsupported by substantial evidence on the record as a whole. Sunshine State Bank v. FDIC, 783 F.2d 1580, 1584 (11th Cir.1986). Moreover, the Supreme Court has defined clearly the limited scope of penalty review: the assessment of a penalty is particularly delegated to the administrative agency. The choice then of a sanction is not to be overturned unless it is "unwarranted in law or ... without justification in fact...." Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185-86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973); Bullion v. FDIC, 881 F.2d 1368, 1372-73 (5th Cir.1989); Brickner v. FDIC, 747 F.2d 1198, 1203 (8th Cir.1984). We find the FDIC's assessments against the petitioners both warranted by law, see pp. 1534-1537 infra, and completely justified, if not required, by the facts of this case. The facts presented in ICB's Quintax and Dublin Bond issue loans and in the Bank's history of continuous regulatory violations, see supra pp. 1527-1530, clearly demonstrate to this court that the ALJ's finding of petitioners' good faith, see supra note 23, is tenuous at best.
 Petitioners also raise several technical issues concerning the FDIC's reading of particular provisions of Regulation O. First, petitioners note that because the Quintax loans did not contain preferential terms and unfavorable features of abnormal risk of repayment, the loans could not violate section 215.4(a), see supra note 6, which they interpret as only proscribing loans containing both defects. The FDIC, on the other hand, reads the language and purpose of section 215.4(a) to require either a showing of preferential terms or more than a normal risk of repayment or unfavorable terms to prove a violation. We agree with the FDIC's reading of section 215.4(a). See Bullion, 881 F.2d at 1374; Groos Nat'l Bank v. Comptroller of Currency, 573 F.2d 889, 897 (5th Cir.1978); see also infra note 35. Not to do so, would defeat the intent of this provision since petitioners' reading of section 215.4(a) would allow protection of a bank that continuously makes loans involving more than the normal risk of nonpayment. Bullion, 881 F.2d at 1374.
 Second, petitioners argue that the "unfavorable features" prong of section 215.4(a) violates basic fairness because it is totally subjective and unenforceably vague. The FDIC correctly notes that in a case, as here, involving neither criminal sanctions nor First Amendment rights, the test for constitutional vagueness is an objective one: whether an objective lender at the time the loan was made would have extended the credit based on the available information at the time. See Bullion, 881 F.2d at 1374-75. Given the facts surrounding ICB's endorsement of the Quintax loans, see supra notes 7-13 and accompanying text, it is hardly surprising that an unsecured loan with out-of-state guarantors made to an entity with a negative net worth would be deemed to contain unfavorable features. It is hard to imagine a less attractive set of terms.
 
 
 [31]
 See, e.g., FDIC Manual of Examination Policies, Section U (Civil Money Penalties) ("The definition [of a 'violation' under section 1828(j)(4)(A) ] is exceptionally broad and will likely encompass any violation of the applicable statutes.")
 
 
 [32]
 Ga.Code Ann. § 7-1-490(a) provides in pertinent part:
 (a) Directors and officers of a bank ... shall discharge the duties of their respective positions in good faith and with that diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances in like positions. In discharging his duties, a director or officer, when acting in good faith, shall be entitled to rely upon information, opinions, reports, or statements, including financial statements and other financial data, in each case prepared or presented by:
 (1) One or more officers or employees of the bank ... whom the director or officer reasonably believes to be reliable and competent in the matters presented;
 ....
 but such director or officer shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause such reliance to be unwarranted. A director or officer who so performs his duties shall have no liability by reason of being or having been a director or officer of the bank....
 Ga.Code Ann. § 7-1-490(a) (Michie 1989).
 
 
 [33]
 Petitioners also invoke the prudent man standard elucidated in the American Law Institute's Principles of Corporate Governance: Analysis and Recommendations § 4.01 (Tent.Draft No. 3, 1984) as additional support for their position because in Fitzpatrick v. FDIC, 765 F.2d 569, 576-77 (6th Cir.1985), the Sixth Circuit, the only circuit to address the standard of care under section 1828(j)(4)(A), cites to it as "appropriate guidance" in deciphering congressional intent in the FDIA. Id. at 576. The sparse case law, however, does not present clear evidence of petitioners' assumed incorporation of state common law standards of care in the FDIA. See, e.g., Fitzpatrick, 765 F.2d at 576-78 (stating both that inadvertent violations are "technical" violations of the FDIA and noting that it might be argued that Congress did not intend to impose strict liability under the FDIA). Moreover, the actual language and legislative history of the statute clearly presents the congressional allocation of additional affirmative fiduciary duties to bank directors--duties, which if not performed, are violated regardless of intent or negligence on the part of the director. See infra notes 38-40 and accompanying text
 
 
 [34]
 Additionally, petitioners contend that to interpret section 1828(j)(4)(A) as imposing such an absolute liability on bank directors would chill businessmen from remaining current directors, as well as from becoming prospective directors, because no outside director could afford to devote the amount of time necessary to avoid such liability without becoming a full-time employee of the bank. See also First Nat'l Bank of N.W.Fla. v. Thurman (In re Thurman), 121 B.R. 888, 890 (Bankr.N.D.Fla.1990) (rejecting the position that director status is a justifiable rationale for the imposition of strict liability on bank directors)
 
 
 [35]
 As the FDIC correctly notes, petitioners' culpability is given due consideration under the FDIA's statutory scheme, see 12 U.S.C. § 1828(j)(4)(B), when calculating the amount of the civil money penalty to be assessed. See generally Groos Nat'l Bank, 573 F.2d at 897 (5th Cir.1978) (stating that "one of the purposes of the banking acts is clearly to commit the progressive definition and eradication of such [violations] to the expertise of the appropriate regulatory agencies") (emphasis added). In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981
 
 
 [36]
 The House Report goes on to state:
 Viewing the overall banking situation, the Federal Deposit Insurance Corporation's study on bank failures between 1960 and 1975 demonstrated that insider loans were the principal cause of almost 60 percent of those failures. A review of the summaries of formal agreements or cease-and-desist orders by bank supervisors against banks over the last 5 years indicates that insider abuses are a significant factor leading to the imposition of such agreements and orders. Discussions of problem bank lists also provide evidence that insider self-dealing is a major reason for the deterioration of a bank's condition.
 H.R.Rep. No. 1383, 95th Cong., 2d Sess. 11, reprinted in 1978 U.S.C.C.A.N. at 9283.
 
 
 [37]
 The FDIA's re-emphasis of bank directors' fiduciary duties in this regard reflects congressional awareness that the burden of policing insider loans cannot fall to the bank's depositors or shareholders because these groups lack the necessary legal authority, managerial expertise, and collegial knowledge of the insider directors in question to prevent insider loans before they occur. Petitioners' reading of the statute, however, by closing the board's eyes to insider loans, see infra pp. 1536-1537, ignoring Congress' allocation, effectively would shift this policing function onto the backs of the bank's depositors and shareholders
 
 
 [38]
 The legislative history states that the primary purpose of the prior approval provisions of the FDIA is to "require[ ] that an institution's board of directors will be fully aware of insider transactions at their institution.... [by] assur[ing] that a board knows how much insiders are borrowing." See H.R.Rep. 1383, 95th Cong., 2d Sess. 16, reprinted in 1978 U.S.C.C.A.N. at 9288 (emphasis added)
 
 
 [39]
 The statute explicitly requires each director to disclose fully his insider loans with correspondent banks to his own board, see H.R.Rep. 1383, 95th Cong., 2d Sess. 16, reprinted in 1978 U.S.C.C.A.N. at 9288. It therefore would defy all logic, as well as the stated purpose of the statute, not to extend this affirmative duty of disclosure to the director's insider loans at his own institution
 
 
 [40]
 Petitioners' assumption that this expansive reading of section 1828(j)(4)(A) imposes "absolute liability" on bank directors, however, is not compelled by the language or purpose of the statute. Although Congress may have intended to impose a regime of strict liability on bank directors in order to create incentives for the prevention of insider loans, but see Fitzpatrick, 765 F.2d at 576 ("it may be argued Congress did not intend to impose a strict liability standard for violations under officers' and directors' oversight"), the language and purpose of the statute does not necessarily preclude the possibility of directors avoiding liability by taking positive action not to participate, cause, bring about, aid or abet in the bank's violation of the FDIA. In other words, if a director fulfills the affirmative duties that the statutory scheme allocates to him--investigating and identifying a loan as an insider loan in violation of the lending limits or creditworthiness provisions of the FDIA and voting "no" to the loan "because it is a violative insider loan"--he may avoid the expansive liability under section 2(j)(4)(A) of the FDIA, even if his board approves the loan. Even under this alternative reading of the statute, however, only such positive steps at prevention will avoid liability; all other actions, including nonnegligent inaction, that can be associated with the making of the loan, will establish director liability. Nevertheless, because the facts of this case do not require us to choose among these two readings of the statute, we leave the question for another day