The FEDERAL DEPOSIT INSURANCE CORPORATION, in its Separate Corporate Capacity and as Receiver of Ingram State Bank, Plaintiff,

v.

Charles SCHREINER, III, et al., Defendants.

Civ. No. SA–93–CA–674.

United States District Court, W.D. Texas, San Antonio Division.

June 23, 1995.

Steven K. DeWolf, David Mace Roberts, Ronquillo & DeWolf, L.L.P., Dallas, TX, for plaintiff.

William H. Oliver, Drought & Pipkin, L.L.P., George H. Spencer, Clemens, Spencer, Welmaker & Finck, Inc., San Antonio, TX, Lavern D. Harris, Harris & Harris, P.C., M. Scott Stehling, Kerrville, TX, Frederick C. Shannon, Jr., Mitchell L. Weidenbach, Shannon, Weidenbach & Estee, Inc., Keith E. Kaiser, Cox & Smith Inc., San Antonio, TX, Steven H. Thomas, Law Offices of Steven H. Thomas, Dallas, TX, for defendants.

*ORDER ON THE MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS SCHREINER, JOHNSTON, MOORE, PRIOUR, BARKER AND SMITH*

SUTTLE, Senior District Judge.

Pending for resolution before the Court are the following motions:

1. Second Motion for Summary Judgment of Defendant Charles Schreiner, III, filed on December 16, 1994;

2. Motion for Summary Judgment of Defendant Raymond F. Barker, filed on December 16, 1994;

3. Motion for Summary Judgment of Defendant Charles H. Johnston, filed on December 15, 1994;[1]

4. Motion for Summary Judgment of Defendant Jane Flato Smith, filed on January 5, 1995;[2] and

5. Motion for Summary Judgment, or in the alternative, for Partial Summary Judgment of Defendant Jasper Moore, Jr., filed on December 23, 1994.[3]

Pursuant to an order granting it leave to do so, the FDIC filed a single response to the defendants' motions on January 5, 1995. Defendant Smith filed a reply to the FDIC's response on January 17, 1995 as did defendant Moore.[4] The FDIC filed its surreply on January 25, 1995. Moore filed supplemental authority to his motion for summary judgment on January 27, 1995. Defendants Smith and Schreiner filed joinders in Moore's supplemental authority on January 30 and 31, 1995, respectively.

### I. *Background*

The Federal Deposit Insurance Company ("FDIC") has brought this action against six[5] former directors and officers of Chas. Schreiner Bank ("CSB"), a state-chartered, federally insured bank located in Kerrville, Texas, and Ingram State Bank ("ISB"), a state-chartered, federally-insured bank in Ingram, Texas. The FDIC was appointed as receiver of CSB and ISB on April 19, 1990 and September 4, 1990, respectively. In its complaint, the FDIC asserts claims of gross negligence and breach of fiduciary duty

---

1. Johnston has filed, as part of his motion, a notice of joinder in the summary judgment motions of the other defendants.

2. Defendant Dale Priour has not filed a motion for summary judgment, but has filed a joinder in Smith's motion. Defendant Moore has also filed a joinder in Smith's motion.

3. Moore, like Johnston, has, as part of his motion, filed a notice of joinder in the summary judgment motions of the other defendants.

4. Moore also joined in Smith's reply as well.

5. Originally, the FDIC sued seven former directors and officers. However, the Court, pursuant to a joint stipulation of dismissal filed by the FDIC and Jack Clarke, Jr., has dismissed the FDIC's claims against Jack Clarke, Jr.

against the defendants for their acts and omissions as directors of CSB in approving, renewing, extending and consolidating loans made to Dale Priour and Ranchmen's Wool and Mohair Export, Inc. ("RWME"), Ranchmen's Wool and Mohair, Inc. ("RWMI"), Priour Varga Wool and Mohair ("PVWM"), L.D. Brinkman, LDB Corporation, and Dale Elmore from 1980 to 1989 and the upstreaming of dividends from CSB to its holding company, Schreiner Bancshares, Inc. ("SBI") in 1988.[6] As to ISB, the FDIC claims that the defendants were grossly negligent and breached their fiduciary duties in permitting ISB to participate in the loans made by CSB to Priour and his related entities. The FDIC seeks to recover approximately $11,800,000 for losses allegedly suffered by CSB and ISB as a result of the defendants' alleged misconduct.

## II. *Summary Judgment Standard*

The Court has previously set out at length the standards by which a motion for summary judgment is reviewed. In a nutshell, summary judgment is appropriate when the movant can demonstrate that no genuine issue of material fact exists and that he/she is entitled to prevail as a matter of law. In determining whether a genuine issue of material fact exists, the evidence is viewed in a light most favorable to the non-movant. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986); Rule 56, Federal Rules of Civil Procedure.

## III. *Defendants' Arguments in Support of Summary Judgment*

Defendants have raised the following arguments in support of their various motions for summary judgment:

1. The FDIC's claims are barred by the Business Judgment Rule.

2. The FDIC's claims are barred by Article 1302–7.06(B) of the Texas Miscellaneous Corporation Laws Act and Article 2.41D of the Texas Business Corporation Act.

3. The dividend payments added by the FDIC's First Amended Complaint do not relate back to the Original Complaint.

4. There is no evidence of gross negligence by the defendants.

5. There is no evidence of breach of fiduciary duties by the defendants.

6. The dividends were authorized by Texas law.

7. Defendant Moore could not have been grossly negligent with respect to actions taken at board meetings which he did not attend due to health problems.

8. No separate damages are attributable to the renewals, extensions, or consolidations of the loans.[7]

---

**6.** The FDIC has judicially admitted that it is not bringing claims for fraud or dishonesty against the defendants. *See* Transcript of Rule 16 Hearing, November 24, 1993, p. 28.

**7.** This order applies only to those loans and dividends which were found not to be time-barred in the order of June 16, 1995, which addressed the defendants' motions asking the Court to reconsider its order denying their various motions to dismiss the FDIC's complaint as time-barred in light of the Fifth Circuit's decision in *RTC v. Acton,* 49 F.3d 1086 (5th Cir.1995). These include the following loans and dividends:

 A. Loans to Ranchman's Wool & Mohair Export, Inc.
 1. CSB Loan 4072569–9070;
 2. CSB Loan 4072569–9072;
 3. CSB Loan 4072569–9071; and
 4. CSB Loan 4072569–9069.
 B. Loans to Priour–Varga Wool & Mohair, Inc.
 1. CSB Loan 3996063–9091;

 2. CSB Loan 3996063–9092; and
 3. CSB Loan 3996063–9093.
 C. Loans to Ranchman's Wool & Mohair, Inc.
 1. CSB Loan 4074811–9094;
 2. CSB Loan 4074811–9096;
 3. CSB Loan 4074811–9101;
 4. CSB Loan 4074811–9100;
 5. CSB Loan 4074811–9097;
 6. CSB Loan 4074811–9099;
 7. CSB Loan 4074811–9095; and
 8. CSB Loan 4074811–9088.
 D. Loans to Dale Priour
 1. CSB Loan 3987967–9031;
 2. CSB Loan 3987967–9030; and
 3. Any extension or renewal of CSB Loan 3987967–9023 on or after April 19, 1988.
 E. Loans to Lloyd Brinkman
 1. CSB Loan 9007;
 2. CSB Loan 9010; and
 3. CSB Loan 9011.
 F. Loans to LDB Corporation
 1. Extension of CSB Loan 9001 on November 1, 1988; and

## IV. *Arguments and Analysis*

### A. *No Evidence of Gross Negligence*

■ The primary argument advanced by the defendants is that the FDIC simply has not come forward with any evidence that their actions rise to the level of gross negligence. The FDIC counters that it has created such an issue through the affidavit of William R. Carden and the bank records and minutes of the board of directors' meetings it has attached as exhibits to its response. As explained below, this Court finds that the FDIC has introduced sufficient evidence to create the requisite issue of material fact regarding the defendants' gross negligence to survive summary judgment disposition.

In his affidavit, Dr. Carden, the FDIC's expert witness, states that, based on his review of the relevant documents and his experience as a lending officer, bank president, and banking consultant, he has arrived at the following opinion concerning the defendants' conduct.

In my opinion the pattern of loans to H. Dale Priour and his related interests represent not only violations of Regulation O but gross negligence in credit underwriting in general. The loans and their numerous renewals were often made:

(1) in reliance upon outdated and inconsistent financial statements of H. Dale Priour;

(2) in the absence of a current financial statement of Bertha Priour;

(3) in reliance on unaudited, inadequate (management compilations), and outdated financial statements for Priour–Varga Wool & Mohair, Inc., Ranchman's Wool & Mohair, Inc., and Ranchman's Wool and Mohair Export, Inc.;

(4) in spite of the fact that management's own financial compilations revealed corporations that were basically insolvent and certainly not credit worthy of the amounts extended;

(5) in reliance upon Mr. Priour as a source of repayment when other indebtedness due from him or his related entities to Chas. Schreiner Bank was nonperforming;

(6) allowing unpaid accrued interest due from Dale Priour or related interests to be rolled into the principal amount of the new loan;

(7) without verifying the ownership and value of the assets listed on Mr. Priour's financial statements;

(8) without confirming the liabilities listed on Mr. Priour's financial statements;

(9) limiting the personal liability of Mr. Priour;

(10) in reliance upon Mr. Priour's unsupported statements as to the values of the collateral;

(11) without obtaining a current independent appraisal of the value of the inventory held as collateral;

(12) despite a decline in Mr. Priour's net worth (yet he continued to receive six figures sums of credit unsecured);

(13) without reviewing Mr. Priour's federal income tax returns;

(14) in spite of a large and high-risk concentration of lending to Mr. Priour and his related entities (an unsafe and unsound concentration of loans in one industry subject to extreme economic uncertainties without adequate safeguards and/or experienced Bank personnel to oversee such matters);

(15) in the absence of any cash flow or repayment analysis or repayment program;

(16) with no credit, bank or trade reference checks;

2. CSB Loan 9002.
G. Loan to Dale Elmore
 1. CSB Loan 9061
H. Dividends

1. Any dividends upstreamed by CSB to Schreiner Bancshares, Inc. on or after April 19, 1988 to repay the loans from Jane Flato Smith to Schreiner Bancshares, Inc.

(17) with no comparison of current to previous financial statements (until it was too late);

(18) with no independent assessment of the viability of the wool and mohair business;

(19) on terms and conditions not available to other borrowers in violation of Regulation O; and,

(20) with a misleading and deceptive pattern of origination and consolidation at maturity that provided a surface picture of loan performance but in reality represented a total disregard for the loan repayment standards set out in the Bank's loan policy and demanded by sensible banking practices.

. . . . .

The same continuing pattern of credit underwriting unconcern, neglect and omission was shown by the Defendants in the various extensions of credit to insider Charles Schreiner (and the Y.O. Ranch)[8] and L.D. Brinkman (and LDB Corporation). As in the case of the loans to H. Dale Priour and his related entities, the Defendant (sic) should have voted against these extensions of credit and their renewals because they involved repeated violations of Regulation O and an abdication of supervisory diligence in the extension of highly risky credits. These separate credits to Schreiner and Brinkman (and their related interests) involved:

(1) violations of Regulation O because they [1] were made on terms and conditions not available to other borrowers, and [2] the funds were at times extended prior to Board approval;

(2) outdated and inadequate personal and corporate financial statements;

(3) no review of the borrower's Federal income tax returns;

(4) non-existent and/or substandard appraisal documents;

(5) no verification of ownership or value of assets on financial statements;

(6) no identification of liabilities listed on financial statements or confirmation of contingent liabilities;

(7) an increase in the amount of the loan in the face of the declining net worth of the borrower;

(8) the lending of funds to pay accrued but unpaid interest;

(9) the extension of additional funds to pay the interest on past due credit;

(10) limiting the personal liability of the borrower;

(11) in reliance upon the borrower's unsupported statements as to the values of the collateral;

(12) despite a relative decline in each respective borrower's net worth (yet each continued to receive large sums of credit unsecured);

(13) requiring either limited or no personal guaranties;

(14) no inspection of the security offered as collateral;

(15) without UCC lien searches;

(16) without perfecting the Bank's security interests;

(17) no credit, bank or trade reference checks on either principal borrower;

(18) no cash flow or repayment analysis or implemented repayment program; and,

(19) a deceptive pattern of origination and consolidation at maturity that provided a surface picture of loan performances but in reality represented a total disregard for the loan repayment standards set out in the Bank's loan policy and demanded by sensible banking practices.

. . . . .

The last operating profit of the Bank was in 1986. In 1987, the Board approved the sale of securities that allowed the Bank to (1) pay $3,500,000 in dividends to the holding company during 1988 ($2,000,000 of which was paid in a special called meeting

8. The FDIC has amended its complaint to remove any claims against the defendants on the loans to Schreiner and the Y.O. Ranch.

on January 11, 1988) and (ii) to continue to show a net profit (and pay an officer bonus) in spite of the fact that the securities bought following the sale of large dollar amounts of securities in November and December 1987 were bought at yields of less than those that were sold. The holding company would not have been able to repay the then due loans from Defendant Smith without these dividends from the Bank. These dividends to the holding company were upstreamed *after* the FDIC had warned the executive committee of the Bank that the then ongoing FDIC examination had revealed the seriousness of the Bank's problems, problems so serious that the Bank's CAMEL rating was going to be dropped to the very poor level of a "4" rating.

*See* Affidavit of Dr. William R. Carden attached to Plaintiff's Response as Exhibit E, pages 19–23, 25. Also attached to the FDIC's response as Exhibit D are the records of the ISB and CSB board minutes and annual shareholder's meetings for the period from January 1, 1983 until the date the FDIC took over control as receiver.[9]

■ In Texas, "gross negligence" is defined to mean "such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected." TEX.CIV.PRAC. & REM.CODE ANN. § 41.001(5) (Vernon 1994). As recently explained by the Texas Supreme Court, gross negligence involves two components: (1) the defendant's act or omission, and (2) the defendant's mental state. *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10, 21 (Tex.1994). As defined, the act or omission element must involve behavior that endangers the rights, safety, or welfare of the person affected. TEX.CIV.PRAC. & REM. CODE ANN. 41.001(5) (Vernon Supp.1994). Thus, gross negligence "differs from ordinary negligence with respect to both elements—the defendant must be 'consciously indifferent' and his or her conduct must 'create an extreme degree of risk'." *Id.*

■ The test for gross negligence, then, "contains both an objective and a subjective component." *Wal–Mart v. Alexander,* 868 S.W.2d 322, 326 (Tex.1993). Subjectively, the defendant must have actual awareness of the extreme risk created by his or her conduct. *Id.* Objectively, the defendant's conduct must involve an "extreme degree of risk," a threshold significantly higher than the objective "reasonable person" test for negligence. *Id.* Extreme risk is a function of both the magnitude and the probability of the anticipated injury to the plaintiff. *Moriel,* 879 S.W.2d at 22. The "extreme risk" prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather "the likelihood of serious injury" to the plaintiff. *Wal–Mart,* 868

9. Ex. D establishes the following with regard to the defendants' service on the board of directors at ISB and CSB.

1. Raymond Barker was an active member of the CSB Board of Directors prior to January 1, 1983 through September 27, 1989, and the ISB Board of Directors prior to January 1, 1983 through November 1, 1989.
2. Jack Clarke, Jr. was an active member of the CSB Board of Directors from February 14, 1985 through April 19, 1990, and the ISB Board of Directors prior to January 1, 1983 through September 14, 1990.
3. Charles Johnston was an active member of the CSB Board of Directors prior to January 1, 1983 through April 19, 1990, and the ISB Board of Directors prior to January 1, 1983 through September 14, 1990.
4. Jasper Moore, Jr. was an active member of the CSB Board of Directors prior to January 1, 1983 through February 21, 1990, and the ISB Board of Directors prior to January 1, 1983 through February 21, 1990.
5. Dale Priour was an active member of the CSB Board of Directors prior to January 1, 1983 through May 25, 1988, and the ISB Board of Directors prior to January 1, 1983 through October 1, 1989. Priour also served as an advisory director at CSB from May 25, 1988 through November 15, 1989.
6. Charles Schreiner, III, was an active member of the CSB Board of Directors prior to January 1, 1983 through May 25, 1988, and the ISB Board of Directors prior to January 1, 1983 through September 14, 1990. Schreiner also served as an advisory director at CSB from May 25, 1988 through April 19, 1990.
7. Jane Flato Smith was an active member of the CSB Board of Directors prior to January 1, 1983 through April 19, 1990, and ISB Board of Directors prior to January 1, 1983 through September 14, 1990.

S.W.2d at 327. An act or omission that is merely thoughtless, careless, or not inordinately risky cannot be grossly negligent. Only if the defendant's act or omission is unjustifiable and likely to cause serious harm can it be grossly negligent. *Moriel,* 879 S.W.2d at 22. In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care. *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981).

To support their position that the FDIC has presented absolutely no evidence that they engaged in conduct that would constitute gross negligence as above-defined, the defendants note that Dr. Carden, the only person designated by the FDIC in response to defendant Smith's Rule 30(b)(6) deposition notice, admitted at his deposition that he (1) had no personal knowledge that their conduct constituted gross negligence; (2) had no personal knowledge that the defendants failed to ensure that the bank's loan policies were complied with; (3) had no firsthand knowledge of what transpired in the board meetings of CSB; (4) had no firsthand knowledge of what transpired during ISB' Board of Directors meetings; (5) had no firsthand knowledge of any instances or issues alleged in the lawsuit or the loan files; and (6) had no firsthand knowledge of any of the facts alleged by the FDIC in this lawsuit. Defendants also point out that counsel for the FDIC repeatedly stipulated that Dr. Carden had no firsthand knowledge of any facts in this lawsuit. This, defendants urge, conclusively establishes that neither Dr. Carden nor anyone else at the FDIC has knowledge of any acts of misconduct by them. Consequently, the FDIC has no evidence with which to create a genuine issue of fact whether or not they were grossly negligent. This, when viewed in the face of their own sworn affidavits denying that they ever acted in a grossly negligent manner, entitles them to summary judgment. This Court is not so persuaded.

It is true that Dr. Carden admitted at his deposition that he has no personal or firsthand knowledge of the allegations made in the FDIC's complaint and that counsel for FDIC stipulated to the same effect. The reason why is obvious. Dr. Carden, not being an employee of either ISB or CSB, could not have firsthand knowledge of what transpired prior to the failure of the banks. However, this is true in any case where the FDIC is bringing suit against former officers or directors of a failed bank. No one associated with the FDIC, including its expert, will ever have personal or firsthand knowledge of what went on in a bank prior to its failure and being placed in the FDIC's receivership for the simple reason that they were not present. This, however, does not compel the conclusion, as defendants urge, that the FDIC has *no evidence* of gross negligence. In fact, this exact argument has been rejected by the Fifth Circuit.

In *Dalton v. FDIC,* 987 F.2d 1216 (5th Cir.1993), Dalton argued that the FDIC was not entitled to summary judgment on a promissory note because the supporting affidavit was inadequate because (1) the affiant (an FDIC account officer) did not have personal knowledge of the loan, (2) the financial records addressed in the affidavit were otherwise inadmissible, and (3) the affidavit did not include as attachments sufficient sworn and certified bank records. The Fifth Circuit rejected Dalton's argument, explaining:

> We have recently held, in RTC v. Camp [965 F.2d 25 (5th Cir.1992) ], *that an affidavit of an FDIC account officer is not defective solely because the officer did not have personal knowledge of the loan transaction when it occurred, and only learned about the loan transaction after the bank went into receivership.* As we noted in *Camp,* "[a]ppellants would have us hold [the receiver] to a standard so strict that summary judgment would be all but impossible for plaintiffs in cases such as these."

*Dalton v. FDIC,* 987 F.2d at 1223 (emphasis added). This same logic applies with equal force to a case where, as here, the FDIC is defending against a motion for summary judgment. To require Dr. Carden to have personal or firsthand knowledge of all the events alleged in the FDIC's complaint would be to hold the FDIC to such a strict standard that it could never withstand a summary judgment motion. Because it arrives

on the scene only after a particular bank has been declared insolvent, the FDIC must, by necessity, rely upon the failed bank's records in cases such as this.

Finally, what the defendants fail to recognize is that their position was implicitly rejected by the Fifth Circuit in *FDIC v. Dawson*, 4 F.3d 1303 (1993). In *Dawson*, the FDIC attempted, as it has done here, to defeat the defendant directors' motion for summary judgment on the issue of adverse domination through the affidavit of its expert. In affirming the district court judgment, the Fifth Circuit found that the affidavit of William Watkins, the FDIC's expert, "raised a genuine issue of fact as to whether the non-defendant directors of TIB may have been negligent, . . . ." 4 F.3d at 1311. Like Dr. Carden, Watkins did not base his affidavit on firsthand or personal knowledge of the defendant directors' activities. Like Dr. Carden, Watkins "reviewed numerous TIB documents and OCC reports regarding TIB." 4 F.3d at 1311. Nevertheless, the Fifth Circuit reviewed Watkins' affidavit to determine whether it presented evidence of more than negligence so as to warrant denial of the defendants' motions for summary judgment. By doing so, the Fifth Circuit acknowledged that Watkins' affidavit, although based only on his review of bank records and OCC reports, was admissible evidence. *See also FDIC v. Fay*, 1993 WL 740984 (S.D.Tex. 1993) (considering and finding the affidavit of Watkins, although raising a fact issue that a majority of directors were negligent, was insufficient to establish gross negligence to apply tolling under adverse domination and, therefore, granting defendants' motion to dismiss gross negligence claims as time-barred).[10]

Dr. Carden states in his affidavit that his opinion that the defendants' actions constituted gross negligence is based on his review of the following documents:

 a. Plaintiff's Original and Amended Complaint;

 b. Minutes of the Board of Directors of the Chas. Schreiner Bank for the period from February 21, 1985 to April 19, 1990;

 c. Minutes of the Annual Stockholders Meeting of Chas. Schreiner Bank of February 14, 1985 and April 10, 1986;

 d. Minutes of the Special Stockholders Chas. Schreiner Bank Meeting of January 11, 1988;

 e. Regulatory Examination Reports;

 1) State of Texas Department of Banking of 1973,

 2) State of Texas Department of Banking of 1974,

 3) State of Texas Department of Banking of 1975,

 4) State of Texas Department of Banking of 1976,

 5) State of Texas Department of Banking of 1977,

 6) State of Texas Department of Banking of 1979,

 7) State of Texas Department of Banking of 1980,

 8) State of Texas Department of Banking of 1985,

 9) State of Texas Department of Banking of 1988,

 10) State of Texas Department of Banking Limited Scope Examination of 1989 (February 15),

 11) State of Texas Department of Banking of 1989 (May 19),

 12) State of Texas Department of Banking of 1989 (December 15),

 13) FDIC Examination of 1974,

 14) FDIC Examination of 1975,

 15) FDIC Examination of 1976,

 16) FDIC Compliance Examination of 1976,

 17) FDIC Examination of 1977,

 18) FDIC Compliance Examination of 1977,

 19) FDIC Examination of 1978,

 20) FDIC Examination of 1980,

 21) FDIC Examination of 1981,

 22) FDIC Examination of 1983,

---

**10.** For the foregoing reasons, the Court has entered a separate order denying Defendant Smith's Motion to Strike Dr. Carden's Affidavit. *See* Docket No. 519.

23) FDIC Examination of October 1987,

24) FDIC Trust Examination of 1987;

f. Peat Marwick Independent Auditors Report, 1987 and 1988;

g. Peat Marwick Management Letters,

1) March 28, 1980,

2) January 29, 1982,

3) January 31, 1983,

4) February 1, 1985,

5) June 5, 1986,

6) February 27, 1987,

7) April 25, 1988,

8) March 29, 1989;

h. Charles Schreiner Bank Call Reports for the periods ending December 31, 1984, 1985, 1986, 1987, 1988 and 1989;

i. Various policy statements passed by the Board of Directors of Charles Schreiner Bank,

1) Funds Management Policy of July 1987 and July 1988,

2) Investment Policy of July 1987 and July 1988,

3) Security Program of July 1987 and August 1988,

4) Loan Policy of September 1987,

5) Code of Ethics Policy of December 1987,

6) Community Reinvest Act Statement of March 1988,

7) Bank Secrecy Act Statement of March 1988,

8) Regulatory Compliance Policy of December 1988,

9) Loan Policy Amendment of March 1989;

j. Various loan documents and supporting information regarding loans to H. Dale Priour and related interests (Ranchman's Wool & Mohair, Inc; Ranchman's Wool & Mohair Export and Priour–Varga Wool & Mohair);

k. Various loan documents and supporting information regarding loans to Charles Schreiner, and Y.O. Ranch, L.D. Brinkman and LDB Corporation;

l. Deposition of Jasper Moore, Jr., Volumes 1 and 2 (February 3, 1989);

m. Video Deposition of Charles H. Johnson (November 22, 1993);

n. Video Deposition of Charles Schreiner, Volumes 1, 2 and 3 (November 18–19, 1993);

o. Declaration of Raymond F. Barker (January 28, 1994);

p. Copies of two recent Texas Supreme Court decisions affecting the definitions of "proximate cause" and "gross negligence", *Wal–Mart v. Alexander* and *Transportation Insurance Company v. Moriel;*

*See* Dr. Carden's affidavit attached to Plaintiff's Response as Ex. E, pp. 11–13.

If, as Dr. Carden avers, the various bank documents he reviewed in fact reflect the actions and omissions which he describes in the earlier quoted portions of his affidavit, the Court finds that this would be sufficient evidence to raise a genuine issue whether the defendants engaged in gross negligence and, consequently, to defeat the defendants' motion for summary judgment. Not only would such acts and omissions by the defendants pose an extreme risk to the welfare of ISB and CSB, they would also constitute evidence that the defendants, despite being cognizant of the extreme risk posed by their conduct, consciously disregarded it and continued to engage in wrongdoing.

Accordingly, the Court finds that the FDIC has introduced sufficient competent evidence to raise a genuine issue as to whether defendants were grossly negligent so as to withstand the defendants' motions for summary judgment.

*B. The Texas Business Judgment Rule*

■ Defendants also argue that the FDIC's claims are barred by the Texas business judgment rule. Specifically, the defendants contend that the Texas business judgment rule is a rule of substantive law under which a corporate director is entitled to a presumption of validity and good faith that cannot be overcome unless the FDIC pleads and proves (1) that the directors' conduct was either ultra vires or fraudulent, or (2) that the directors had a personal interest in the transactions complained of. The FDIC

raises two arguments in response. First, the FDIC argues that the business judgment rule serves only as a defense to a negligence or breach of duty action brought by shareholders against a bank officer or directors. In support of this argument, the FDIC notes that *Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707 (5th Cir.1984), and *Cates v. Sparkman*, 73 Tex. 619, 11 S.W. 846 (1889), the case to which the *Gearhart* panel cited in concluding that the Texas business judgment rule would protect noninterested corporate directors from liability unless the challenged action is ultra vires or is tainted by fraud, as well as all the other cases cited in support of this statement were suits brought by a minority shareholder, not by the corporation itself. Regardless, the FDIC claims it has produced evidence that the defendants breached their fiduciary duties in a grossly negligent manner.

The FDIC's first argument was recently rejected in *FDIC v. Benson*, 867 F.Supp. 512 (S.D.Tex.1994), where the district court noted:

> This Court finds that the Texas business judgment rule does not function simply as a defense to claims of negligence or breach of fiduciary duty by corporate directors. [*FDIC. v.* ] *Brown*, 812 F.Supp. [722] at 724 [ (S.D.Tex.) ]; [*RTC v.* ] *Holmes, supra* [1992 WL 533256 (S.D.Tex.1992) ]. As stated by Judge Lake and Judge Rosenthal, the Texas business judgment rule is a substantive rule of law that requires of the FDIC both pleading and proof to avoid its reach. *Id.* This Court also concurs with Judge Lake that the FDIC's unsupported contention that in Texas a higher standard should apply to the conduct of bank officers and directors and that the business judgment rule applies only to suits brought against them on behalf of the shareholders in their own interest, and not to actions brought on behalf of the bank, is not persuasive. *Brown*, 812 F.Supp. at 724 n. 2. The FDIC's main authority, [*FDIC v.* ] *Wheat* [970 F.2d 124 (5th Cir.1992) ], did not hold that the business judgment rule is limited to a defense in a negligence or breach of fiduciary action against a corporate director but merely approved of a jury instruction on such a defense. In that case

the defendant director was found liable because he had personal interest approving an inadequately secured loan. There is no indication if he raised the business judgment rule before the case was submitted to the jury. The Circuit approved of a defensive instruction providing that

> You are instructed that a director or officer of a bank shall not be liable for claims against him if, in the discharge of his duties, he exercised ordinary care and acted in good faith and honestly exercised his best business judgment within the limits of the actual authority of his position with the bank.
>
> A director or officer of a bank shall not be held liable for an honest mistake or judgment if he acted with due care, in good faith, and in furtherance of a rational business purpose.

970 F.2d at 130–31 and n. 13. Moreover, the FDIC's theory would require the Court to conclude that *Wheat* overturned *Gearhart*, in contravention of the Fifth Circuit's long-standing rule that only an en banc court, not a panel, can overturn an earlier panel's ruling. *Ford v. United States*, 618 F.2d 357, 361 (5th Cir.1980).

*Benson*, 867 F.Supp. at 521. This Court believes that *Benson* adequately explains the flaws in the FDIC's first argument and rejects it on the same basis. *See also FDIC v. Daniel*, 158 F.R.D. 101, 103 (E.D.Tex.1994) (under Texas business judgment rule, noninterested directors of corporation cannot be sued absent a showing of ultra vires, fraud, or gross negligence).

■■■■ As for what types of actions the business judgment rule will not protect, the consensus among the district courts in Texas is that, under the Texas business judgment rule, corporate officers and directors are liable, at a minimum, for grossly negligent acts. *See FDIC v. Daniel*, 158 F.R.D. 101 (E.D.Tex.1994) (under Texas business judgment rule, noninterested directors of corporation cannot be sued absent a showing of ultra vires, fraud, or gross negligence); *FDIC v. Benson*, 867 F.Supp. 512 (S.D.Tex. 1994) (to avoid protective shield of Texas business judgment rule, plaintiff must show

that acts of directors and officers were ultra vires or tainted by fraud, or a complete abdication of duty; noting that Texas business judgment rule will protect a director even if his acts are ultra vires, as long as they are not grossly negligent or a complete abdication of duty); *RTC v. Acton*, 844 F.Supp. 307 (N.D.Tex.1994) (in general, Texas business judgment rule restricts liability of officers and directors for liability for acts of gross negligence, which may include complete abdication of their responsibilities); *FDIC v. Harrington*, 844 F.Supp. 300 (N.D.Tex.1994) (under Texas business judgment rule, corporate officers are liable only for grossly negligent acts); *RTC v. Norris*, 830 F.Supp. 351 (S.D.Tex.1993) (Texas business judgment rule does not preclude RTC from asserting claims against outside directors based on allegations that they were grossly negligent); *FDIC v. Brown*, 812 F.Supp. 722 (S.D.Tex.1992) (Texas business judgment rule does not bar claims for gross negligence against disinterested corporate directors; Texas business judgment rule does not protect director if director abdicated his responsibility and failed to exercise any judgment, rule necessarily presumes that directors exercise their judgment).[11] Accordingly, this Court finds that the FDIC can avoid the Texas business judgment rule only if it alleges and proves that the defendants engaged in:

1. ultra vires acts involving gross negligence or a complete abdication of responsibility;

2. acts of fraud; or

3. acts of gross negligence.

As noted by the Court in its order of March 24, 1994,[12] the FDIC has made a judicial admission that it is not bringing a claim for fraud or dishonesty against the defendants. Therefore, it is bound to prove that the defendants engaged in one of the remaining two categories of acts.

The Court has already determined that the FDIC has come forth with sufficient evidence to create a genuine issue whether the defendants engaged in grossly negligent behavior with regard to the loans and the upstreaming of the dividends. Therefore, the Texas business judgment rule does not defeat the FDIC's claim for gross negligence. This leaves the question whether the FDIC has come forward with evidence that the defendants engaged in ultra vires acts. However, as explained below, this issue can be disposed of by the Court in the course of determining whether the FDIC introduced any evidence that the defendants breached their fiduciary duties in a grossly negligent manner.

In Texas, three duties arise from the fiduciary status of corporate directors; namely, the duties of obedience, loyalty and due care. *Gearhart Indus., Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 719 (5th Cir. 1984). The duty of obedience requires a director to avoid committing ultra vires acts, i.e., acts beyond the scope of the powers of a corporation as defined by its charter or the laws of the state of incorporation, in this case, Texas. *Id.* The duty of loyalty dictates that a director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation. *Id.* The duty of care requires the director to be diligent and prudent in managing the corporation's affairs. *Id.* at 720.

Defendants maintain that the FDIC has presented no evidence to support its allegations that they breached any of these duties. The FDIC replies that Dr. Carden's affidavit is sufficient to raise a genuine issue whether the defendants engaged in conduct that breached their fiduciary duties. The Court will evaluate the sufficiency of the FDIC's evidence as to each duty.

1. *Grossly Negligent Breach of the Duty of Obedience*

As noted, the duty of obedience requires a director to avoid committing ultra

---

**11.** As noted by the district court in *Acton*, the Texas legislature gave added weight to the *Gearhart* standard of liability when it enacted House Bill 1076, which explicitly provides that officers and directors may be held liable only for acts of gross negligence.

844 F.Supp. at 307 n. 8.

**12.** *See* Docket No. 91.

vires acts. An ultra vires act, negligent or not, may be voidable under Texas law, but the director is not personally liable for it unless the action in question is also illegal. *Gearhart,* 741 F.2d at 719. An illegal act in this context is one in violation of a specific statute, malum in se, malum prohibitum, or against public policy. *Id.* (citing *Staacke v. Routledge,* 111 Tex. 489, 241 S.W. 994, 998–99 (1922)). Dr. Carden states in his affidavit that defendants knowingly approved, renewed and extended loans to insiders Priour and Brinkman[13] and their related entities that were not substantially on the same terms, including interest rate and collateral, as those prevailing at the time for comparable transactions with persons not associated with the bank. Such loans, Dr. Carden claims, were in clear violation of 12 C.F.R. Part 215, commonly referred to as "Regulation O."

■ Regulation O provides in pertinent part:

§ **215.4 General prohibitions.**

(a) *Terms and creditworthiness.* No member bank may extend credit to any of its executive officers, directors, or principal shareholders or to any related interest of that person unless the extension of credit;

(1) Is made on substantially the same terms (including interest rates and collateral) as, and following credit underwriting procedures that are not less stringent than, those prevailing at the time for comparable transactions by the bank with other persons that are not covered by this part and who are not employed by the bank; and

(2) Does not involve more than the normal risk of repayment or present other unfavorable features.

*Id.*[14]

Here, Dr. Carden states that his review of the loan documents and other relevant material reveals that the defendants not only approved loans to Priour and Brinkman and their related entities on terms, including interest rates and collateral, that were not substantially the same for comparable loans to people not associated with the bank, he also enumerates the specific ways in which the defendants' actions were in conscious disregard of acceptable credit underwriting standards and the bank's own loan policy. *See* Carden Affidavit, Ex. E, pp. 19–23. The Court finds that this suffices to create a genuine issue whether the defendants violated Regulation O in making the loans and therefore breached their fiduciary duty of obedience. This same evidence likewise creates an issue as to whether the defendants engaged in ultra vires acts involving gross negligence or a complete abdication of their responsibilities.

### 2. *Grossly Negligent Breach of the Duty of Loyalty*

■ The FDIC asserts that the defendants breached their duty of loyalty to CSB when they approved the sale of securities in 1987 and then approved the upstreaming of $3,500,000 in dividends in early 1988 to SBI despite the fact that 1986 was the last year CSB operated at a profit and despite the fact the FDIC examiners had warned CSB that its CAMEL rating was being downgraded to the very poor level of a "4" rating. Without these dividends, the FDIC claims, SBI would not have been able to repay defendant Jane Flato Smith for loans she had made to the SBI from 1985 to 1988.

■ The duty of loyalty dictates that a director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation. Whether a director is "interested" is a question of fact. *Gearhart,* 741 F.2d at 719.

In *Gearhart,* the Fifth Circuit held:

A director is considered "interested" if he or she (1) makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity, . . . (2)

---

**13.** The loans to Brinkman and his related entities were subject to the provisions of Regulation O because Brinkman became a major stockholder of SBI, CSB's holding company, by September 4, 1986.

**14.** Regulation O is made applicable to insured state nonmember banks, such as CSB and ISB, by section 2[18](j)(2) of the Federal Deposit Insurance Act, 12 U.S.C. § 1828(j)(2), and 12 C.F.R. § 337.3 (1988). *Lowe v. FDIC,* 958 F.2d 1526, 1527 n. 2 (11th Cir.1992).

buys or sells assets of the corporation, ... (3) transacts business in his director's capacity with a second corporation of which he is also a director or significantly financially associated, ... or (4) transacts business in his director's capacity with a family member.

741 F.2d at 719–20. The Texas Banking Code utilizes this exact same standard to define when a bank officer or director is disinterested.[15]

The FDIC earlier alleged that Jane Flato Smith and Jasper Moore, Jr. were interested directors as that term is defined under art. 342–410(C)(4). However, in its order of December 6, 1994 denying the FDIC's motion for reconsideration and clarification of the Court's order of March 24, 1994, the Court found that neither defendant fit within the definition of an interested director under art. 342–410(C)(4). The FDIC has not alleged or made any showing that any of the remaining defendants were interested directors. Therefore, the FDIC has not presented any evidence to support its claim that the defendants breached their fiduciary duty of loyalty.

Accordingly, the Court finds that the defendants are entitled to summary judgment on the FDIC's claim that they breached their fiduciary duty of loyalty.

### 3. Grossly Negligent Breach of the Duty of Care

 As already noted, claims for gross negligence are not barred by the business judgment rule in Texas. *FDIC v. Brown*, 812 F.Supp. at 725, citing *Cates*, 73 Tex. at 622, 11 S.W. at 849 ("injurious practices, abuse of power, and oppression on the part of the company or its controlling agency clearly subversive to the rights of the minority, or a shareholder" are not protected by the business judgment rule) and *Burk Royal-*

ty Co. v. Walls, 616 S.W.2d 911, 920 (Tex. 1981) (gross negligence defined as "entire want of care"). The question of director negligence is a question of fact and must be decided on a case-by-case basis. *Gearhart*, 741 F.2d at 720. The Court has already determined that the affidavit of Dr. Carden raises a genuine issue whether the defendants were grossly negligent in making loans and upstreaming the dividends to SBI to pay off the loans from Smith. Not only is there evidence that the loans and dividends approved by the defendants posed an extreme risk of harm to CSB, there also is evidence that defendants were aware, through the various examiner reports and management letters, of the risk to which their actions exposed the bank but disregarded it. This, in the Court's opinion, serves to create a fact issue whether the defendants breached their fiduciary duty of care in a grossly negligent manner.

Accordingly, the Court finds that the FDIC's claim of grossly negligent breach of fiduciary duty of care is not barred by the Texas business judgment rule.

### C. Texas Miscellaneous Corporation Laws Act Article 1302–7.06

 Defendants also urge that they are entitled to summary judgment because the FDIC's claims are barred under Article 1302–7.6(B) of the Texas Miscellaneous Corporation Laws Act. This contention fails.

Article 1302–7.06(B) provides:

The articles of incorporation of a corporation may provide that a director of the corporation shall not be liable, or shall be liable only to the extent provided in the articles of incorporation, to the corporation or its shareholders or members for the monetary damages for an act or omission in the director's capacity as a director,

---

**15.** The Texas Banking Code provides:

A director or officer is disinterested with respect to a decision or transaction if the decision or transaction does not involve:

(1) personal profit for the director or officer by dealing with the insured depository institution or usurping an opportunity of the institution;

(2) buying or selling assets of the insured depository institution;

(3) dealing with another insured depository institution or a corporation or other entity in which the director or officer:

(A) is also a director or officer; or

(B) has a significant financial interest; or

(4) dealing with a family member of the director or officer.

TEX.BANK.CODE art. 342–410(C) (Vernon Supp.1993).

except that this article does not authorize the elimination or limitation of the liability of a director to the extent the director is found liable for:

(1) a breach of the director's duty of loyalty to the corporation or its shareholders or members;

(2) an action or omission not in good faith that constitutes a breach of duty of the director to the corporation or an act or omission that involves intentional misconduct or a knowing violation of the law;

(3) a transaction from which the director received an improper benefit, whether or not the benefit resulted from an action taken within the scope of the director's office; or

(4) an act or omission for which the liability of a director is expressly provided by an applicable statute.

TEX.MISC.CORP.LAWS art. 1302–7.06(B) (Vernon Supp.1995).

The articles of association of CSB and ISB were amended on October 7, and September 28, 1987, respectively, to incorporate the liability of limitation provisions of art. 1302–7.06(B).[16]

Initially, the Court notes, although the FDIC has not raised it, that art. 1302–7.06 applies only to an act or omission occurring after August 31, 1987, the effective date of the Texas Miscellaneous Corporation Laws Act.[17] However, as explained below, the Court finds that the FDIC has adduced sufficient evidence to create a genuine issue whether the defendants engaged in acts and/or omissions after August 31, 1987 that fall without the protection of art. 1302–7.06.

■ This Court has already determined that there is evidence that the defendants engaged in conduct in approving, ratifying and extending loans which may have been grossly negligent and which may have also constituted grossly negligent breaches of their fiduciary duties of obedience and care. Defendants may be held liable for such conduct pursuant to 12 U.S.C. § 1821(k) and Tex.Civ.Stat.Ann. art. 342–410. The Court has further determined that this same conduct may have been in violation of Regulation O. Defendants are clearly not protected from liability for such acts or omissions under the express terms of art. 1302–7.06(B)(2) and (4).

Accordingly, defendants' motions for summary judgment on the ground that they are protected from liability by Art. 1302–7.06(B) of the Texas Miscellaneous Corporation Laws Act are DENIED.

D. *Article 2.41D of the Texas Business Corporation Act*

■ Defendants also move for summary judgment on the ground that they relied in good faith on the advice and information provided by, *inter alia,* legal counsel, bank officers and employees, accountants and other consultants. Therefore, they argue, they are shielded from liability by Article 2.41D of the Texas Business Corporation Act.

Art. 2.41D provides as follows:

In the discharge of any duty imposed or power conferred upon a director, including a member of a committee, the director, may in good faith and with ordinary care, rely on information, opinions, reports, or statements, including financial statements and other financial data, concerning the corporation or another person, that were prepared or presented by:

---

**16.** The articles of association of both CSB and ISB were amended as follows:

Article Eight: The Corporation shall have the power to indemnify its directors, officers, employees and agents and to purchase and maintain liability insurance for those persons as, and to the fullest extent, permitted by Articles 2.02–1 of the Texas Business Corporation Act, now or as hereafter amended.

Article Nine: To the fullest extent not prohibited by law, a director of this Corporation shall not be liable to the Corporation or its shareholders for monetary damages for an act or omission in the director's capacity as a director.

*See* Schreiner's Second Motion for Summary Judgment, Ex. A and B, respectively.

**17.** Section 2 of the 1987 Act provides:

"This Act applies only to an act or omission occurring on or after the effective date of this Act. An act or omission occurring before the effective date of this Act is governed by the law in effect when the act or omission occurred, and that law is continued in effect for that purpose."

(1) one or more officers of employees of the corporation;

(2) legal counsel, public accountants, investment bankers, or other persons as to matters the director reasonably believes are within the person's professional or expert competence; or

(3) a committee of the board of directors of which the director is not a member.

A director is not relying in good faith within the meaning of this Section if the director has knowledge concerning the matter in question that makes reliance otherwise permitted by this Section unwarranted.

TEX.BUS.CORP.ACT ANN. art. 2.41 (Vernon Supp.1995).

Defendants Barker,[18] Johnston,[19] Priour[20] and Smith[21] have submitted supporting affidavits in which they aver that they relied in good faith on the advice and information given to them by the bank attorneys, outside auditors and other consultants in approving the loans and dividends at issue. However, according to Dr. Carden, the defendants were not justified in relying on the information provided them with relation to the loans and renewals because the information was outdated, uncorroborated, incomplete, inadequate, or, in many instances, totally missing, as enumerated by Dr. Carden in his affidavit. Thus, Dr. Carden states, it would have been apparent to the defendants that the loans and their renewals were being written with

virtually no credit underwriting standard being observed and in contravention of the bank's own loan policy. Furthermore, the defendants had been warned on several occasions by bank examiners of the deficiencies in their loan practices. The FDIC also has adduced evidence that the defendants, particularly defendant Moore, knew that Dale Priour and his related entities were experiencing serious financial difficulties, yet continued to extend credit to them. In light of this, the Court finds that the FDIC has adduced sufficient evidence to raise a genuine issue as to whether the defendants could have relied in good faith on the information provided them by the bank employees, lawyers, and other consultants in making and/or renewing the loans.

Accordingly, the defendants' motions for summary judgment on this ground is DENIED.

### E. The Dividends

▮ Defendants contend that they were not grossly negligent in approving the dividends to SBI in 1988. The dividends did not cause CSB to become insolvent or exceed CSB's surplus. Therefore, the dividends complied with Texas law and they are shielded from liability by TEX.BUS.CORP.ACT ANN. art. 2.41(A)(1).[22] Defendants also claim protection from liability under TEX. BUS.CORP.ACT ANN. art. 2.41(C)[23] be-

---

**18.** *See* Jane Flato Smith's Motion for Summary Judgment, Appendix, Ex. A.

**19.** *Id.*, Ex. B.

**20.** *Id.*, Ex. C.

**21.** *Id.*, Ex. D.

**22.** Art. 2.41(A)(1) provides as follows:

Directors of a corporation who vote for or assent to a distribution by the corporation that is not permitted by Article 2.38 of this Act shall be jointly and severally liable to the corporation for the amount by which the distributed amount exceeds the amount permitted by Article 2.38 of this Act to be distributed; provided that a director shall have no liability for the excess amount, or any part of that excess, if on any date after the date of the vote or assent authorizing the distribution, a distribution of that excess or that part would have been permitted by Article 2.38.

**23.** Art. 2.41(C) provides in relevant part as follows:

A director shall not be liable under Subsection (1) of Section A of this Article if, in voting for or assenting to the distribution, the director:

(1) relied in good faith and with ordinary care upon the statements, valuations, or information referred to in Article 2.38–3 of this Act, or upon other information, opinions, reports, or statements, including financial statements and other financial data, concerning the corporation or another person, that were prepared or presented by:

(a) one or more officers or employees of the corporation;

(b) legal counsel, public accountants, investment bankers, or other persons as to matters the director reasonably believes are within the person's professional or expert competence; or

(c) a committee of the board of directors of which the director is not a member;

cause they relied in good faith on the information provided by independent auditors, officers, and other directors concerning the financial condition of CSB in approving the dividends.

 Article 2.38 of the Texas Business Corporation Act provides in pertinent part as follows:

B. A distribution may not be made by a corporation if:

(1) after giving effect to the distribution, the corporation would be insolvent;[24] or

(2) the distribution exceeds the surplus[25] of the corporation.

*Id.* In his affidavit, Dr. Carden refutes the defendants' claim that CSB had a surplus from which to declare the dividends to SBI. According to Dr. Carden, CSB last operated at a profit in 1986. Therefore, the defendants, in order to raise the capital to finance the dividends it upstreamed to SBI in 1988, sold the bank's securities in 1987 and then purchased other securities at yields less than the yields of those it had sold. Thus, CSB was able to give the false impression that it had a surplus from which to declare the dividends. If defendants did in fact manufacture a false surplus and then declared

dividends from it, they clearly would have done so in violation of art. 2.38 and, consequently, would not be shielded from liability under art. 2.41(A)(1) or 2.41(C). Moreover, such conduct would constitute gross negligence as previously defined.

The Court is unable to ascertain from the sketchy and incomplete evidence before it, including Ex. C and D to defendant Moore's summary judgment motion, whether CSB posted a profit in 1987 and, if so, whether it did so by the ruse described by Dr. Carden. Therefore, the Court finds that the defendants have failed to disprove the existence of an issue as to whether the dividends were declared in conformity with Texas law and in good faith reliance on the information provided by others.

Accordingly, the defendants' motions for summary judgment on the ground that the dividends were approved in compliance with Texas law is DENIED.

### F. Defendant Moore: Absence of Gross Negligence?

 Defendant Moore asserts that he cannot be held liable for any loans renewed or extended at board meetings from which he was absent due to health problems.[26] The

---

(2) acting in good faith and with ordinary care, considered the assets of the corporation to be at least of their book value.

**24.** "Insolvency" means the inability of a corporation to pay its debts as they become due in the usual course of business. TEX.BUS.CORP.ACT ANN. art. 1.02(A)(10) (Vernon's Supp.1995).

**25.** "Surplus" means the excess of the net assets of a corporation over its stated capital. *Id.* art. 1.02(A)(21).

"Net assets" means the amount by which the total assets of a corporation exceed the total debts of the corporation. *Id.* art. 1.02(A)(13).

"Stated capital" means, at any particular time, the sum of:

(a) the par value of all shares of the corporation having a par value that have been issued;

(b) the consideration fixed by the corporation in the manner provided by Article 2.15 of this Act for all shares of the corporation without par value that have been issued, except such part of the consideration that is actually received therefor (which part must be less than all of that consideration) that the board by resolution adopted no later than sixty (60) days after the issuance of those shares may have allocated to surplus; and

(c) such amounts not included in paragraphs (a) and (b) of this subsection as have been transferred to stated capital of the corporation, whether upon the payment of a share dividend or upon adoption by the board of directors of a resolution directing that all or part of surplus be transferred to stated capital, minus all reduction from such sum as have been effected in a manner permitted by law. *Id.* art. 1.02(A)(18).

**26.** The dates of the meetings from which Moore claims he was absent and the loans which were approved at the meetings are:

1. August 20, 1986

| | |
|---|---|
| Priour: | $ 50,000 |
| PVWM: | $ 675,000 |
| RWME: | $ 300,000 |
| RWMI: | $ 200,000 |

2. September 22, 1987

| | |
|---|---|
| PVWM: | $400,000 |
| RWME: | $300,000 |
| RWMI: | $450,000 |

3. October 26, 1987

| | |
|---|---|
| Priour: | $ 50,000 |
| PVWM: | $ 350,000 |

FDIC counters that Moore's inability to attend the meeting does not excuse him from meeting his obligations and duties as a director. Moreover, as an absent director, he had an affirmative duty to object to any action taken by the board in his absence. This is especially true in Moore's case, argues the FDIC, because he possessed information or knowledge about the distressed financial condition of Priour and his related entities that should have been revealed to the other directors prior to their making and renewing loans to Priour and his related entities. By not doing so, Moore was grossly negligent and breached his fiduciary duties.

Moore has not cited and the Court has not found any Texas case authority to support his argument. Furthermore, the FDIC has pointed to evidence that Moore, despite knowing of the financial straits of Priour and his businesses, made no effort to communicate this information to the other directors either prior or subsequent to their approving the loans to Priour and his related entities. In other words, Moore acquiesced in the actions of the other directors which was grossly negligent and, in doing so, was himself engaging in grossly negligent conduct. In light of this, the Court finds that the FDIC has shown the existence of an issue as to whether Moore, despite his absence, was grossly negligent with regard to the approval, renewal, or extension of the loans to Priour and his related entities in his absence.

Accordingly, the Court finds that defendant Moore's motion for summary judgment on this ground should be DENIED.

| | RWME: | $1,075,000 |
|---|---|---|
| | RWMI: | $ 894,000 |

4. November 23, 1987

| | Priour: | $ 50,000 |
|---|---|---|
| | RWME: | $ 250,000 |
| | RWMI: | $ 300,000 |

5. December 16, 1987

| | Priour: | $ 25,000 |
|---|---|---|
| | PVWM: | $ 425,000 |
| | RWMI: | $ 350,000 |

6. February 25, 1988

7. March 30, 1988

## G. Relation Back of the Dividends to FDIC's Original Complaint

The defendants argue that the claim concerning the dividends which was added by the FDIC in its First Amended Complaint does not relate back to the claims raised in its Original Complaint and therefore is time-barred. The Court has already addressed this argument in a separate order [27] denying the motion of Jane Flato Smith to reconsider its previous orders [28] holding that the dividends claim relates back to the claims alleged by the FDIC in its Original Complaint. For the reasons stated therein, this same argument is rejected in the summary judgment context.

Accordingly, the defendants' motions for summary judgment on the ground that the dividend claim is barred by limitations are DENIED.

## H. Loan Renewals, Extensions and Consolidations

■ Defendants insist that they are entitled to summary judgment as to the subject renewals, extensions, and consolidations of the loans because the FDIC has alleged that the loans were improper at origination and the defendants were grossly negligent in originally approving them. Therefore, any damages claimed arose from the original loans. Moreover, the damage model designed by the FDIC's expert does not identify any separate damages arising from any renewal, consolidation, or extension of the loans. Thus, defendants argue, summary

See Moore's Motion for Summary Judgment, Ex. 5–A through 5–G.

**27.** See Court's order dated June 7, 1995. (Docket # 513).

**28.** The Court denied the defendants' various motions to dismiss in an order dated March 22, 1994. (Docket # 88). Moore then filed a motion for clarification on April 7, 1994 in which he argued, *inter alia*, the non-applicability of Rule 15 to the dividends claim added by the FDIC in its First Amended Complaint. (Docket # 110). In an order dated April 22, 1994, the Court rejected Moore's argument, finding that the dividends claim "arises from the conduct and transactions of which the FDIC complains in its original complaint." (Docket # 119).

judgment is appropriate as to the renewals, extensions, and consolidations.

The FDIC makes a two-part response. First, it argues that the bank records of CSB establish that these renewals, extensions, and consolidation were, in reality, new loans created by defendants to pay off the old loans and, at the same time, mask the fact that they were not performing. Moreover, according to Dr. Carden, these loans, like the original loans, were made in total disregard for loan underwriting procedures and bank lending policy and on terms that violated Regulation O. Furthermore, each of these new loans ultimately failed and caused losses to CSB and ISB. Therefore, the FDIC contends, it has stated a claim against the defendants for each such loan. In the alternative, the FDIC argues that, even assuming the loans were in fact renewals, extensions, and consolidations, bank directors can be held liable not only for grossly negligent loans, but also for grossly negligent extensions and renewals of loans, citing *FDIC v. Robertson,* 1989 WL 94833, at *5–6 (D.Kan.1989) (unpublished opinion). Therefore, assuming, as Dr. Carden claims the bank documents reflect, the defendants were grossly negligent in approving such renewals, extensions, or consolidations, they may be held liable for such conduct.

As this Court explained in its order of April 22, 1994, the Fifth Circuit has implicitly rejected the defendants' argument in *FDIC v. Mijalis,* 15 F.3d 1314 (5th Cir.1994). In *Mijalis,* the district court refused to give a jury instruction proposed by the defendant directors. On appeal, the defendants argued that the district court, by refusing to give the requested instruction, had given the jury insufficient guidance to be able to separate damages caused by imprudent loans made before 1981, of which the FDIC's complaint contained no complaint, from damages caused by imprudent renewals granted after January 1, 1981. Among the several responses it interposed to this argument, the FDIC responded, as it has in the instant case, that the defendants could be held liable

for imprudent extensions and renewals of loans, as well as for imprudent loans themselves, citing *FDIC v. Robertson,* 1989 WL 94833, at *5–6 (D.Kan.1989) (unpublished opinion).

The Fifth Circuit affirmed the district court's refusal to give the requested instruction, explaining:

> The jury interrogatories asked the jury to assign a damages amount to each problem loan or set of loans. Additionally, the jury was required to make factual findings as to *when* the grossly negligent acts and omissions that caused the damages occurred. The interrogatories required the jury to find what portion of the damages attributable to each loan or set of loans was traceable to grossly negligent acts and omissions occurring before 1981, between 1981 and 1983, during 1984, and after 1984. The jury found in every case that no damages were traceable to acts or omissions occurring before 1981. *We hold that these interrogatories afforded sufficient guidance to the jury in separating the funding of loans and the renewal of loans or the transfer of loans to new borrowers.*

*Mijalis,* 15 F.3d at 1325 (emphasis in original) (emphasis added). By approving the interrogatories and affirming the judgment against the defendant directors, the Fifth Circuit recognized that the defendant directors could be held liable for grossly negligent renewals and extensions of loans. In fact, this point was conceded by the defendants. *Id.*

Based on *Mijalis,* the Court agrees with defendants that the FDIC would not be entitled to damages on the extensions, renewals and consolidation of the loans if the jury were to determine that the defendants were grossly negligent in making the loans in the first place. Obviously, the FDIC is entitled to only one recovery. However, the only loans as to which the Court has found the FDIC's claims are not time-barred consists of 15 consolidation loans,[29] three original

29. The surviving consolidation loans are:
1. CSB Loan 4072569–9070;
2. CSB Loan 4072569–9072;
3. CSB Loan 4072569–9071;
4. CSB Loan 4072569–9069;
5. CSB Loan 3996063–9091;
6. CSB Loan 3996063–9092;
7. CSB Loan 3996063–9093;

loans [30] and six extension loans.[31] Therefore, the jury in this case, unlike the jury in *Mijalis,* will be asked to determine only if the defendants were grossly negligent or breached a fiduciary duty at the time they approved the fifteen consolidation loans listed in footnote 29, *supra,* the three original loans listed in footnote 30, *supra,* or the six [32] extension loans listed in footnote 31, *supra.*

Accordingly, the defendants' motions for summary judgment on the ground that no damages arose from their renewal, extension, or consolidation of the loans are DENIED.

### V. *Conclusion*

In summary, it is ORDERED that the motions for summary judgment of the defendants Charles Schreiner, III, Raymond F. Barker, Charles H. Johnston, H. Dale Priour, Jasper Moore, Jr., and Jane Flato Smith be, and the same are hereby, GRANTED as to the Plaintiff's claim that the defendants breached their fiduciary duty of loyalty.

IT IS FURTHER ORDERED that the motion for summary judgment of the defendants Charles Schreiner, III, Raymond F. Barker, Charles H. Johnston, H. Dale Priour, Jasper Moore, Jr., and Jane Flato Smith be, and the same are hereby, DENIED in all other things.

SO ORDERED.

8. CSB Loan 4074811–9094;
9. CSB Loan 4074811–9096;
10. CSB Loan 4074811–9101;
11. CSB Loan 4074811–9100;
12. CSB Loan 4074811–9099;
13. CSB Loan 4974811–9095;
14. CSB Loan 3987967–9031; and
15. CSB Loan 3987967–9030.

30. The surviving three original loans are:

1. CSB Loan 4074811–9097;
2. CSB Loan 4074811–9088; and
3. CSB Loan No. 9061.

31. The surviving extension loans are:

1. CSB Loan 9007;

2. CSB Loan 9010;
3. CSB Loan 9011;
4. CSB Loan 9001;
5. CSB Loan 9002; and
6. Each extension of CSB Loan 3987967–9023 on or after April 19, 1988.

32. As the Court noted in its order of June 16, 1995 (Docket No. 521), the FDIC has claimed that CSB Loan 3987967–9023 was renewed and extended five times over a three year period between 1986 through December 1989, but failed to give the exact date of each extension. The Court has ordered the FDIC to produce that information. Based on the FDIC's response, the Court will amend the instant order to accurately reflect the number of surviving extension loans.